***********
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Chapman. The appealing party has not shown good grounds to reconsider the evidence, receive further evidence or rehear the parties or their representatives. The Full Commission AFFIRMS with some modifications the Opinion and Award of the Deputy Commissioner.
 ***********
The Full Commission finds as fact and concludes as matter of law the following which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. An employee-employer relationship existed between plaintiff and defendant on the date of the alleged injury.
2. Defendant-employer is self-insured.
3. Plaintiff alleges that the date of her injury by accident, a rotator cuff tear to the left shoulder, is January 9, 2002 and the onset date of the occupational disease for both of her shoulders is February 17, 2003.
4. Plaintiff's average weekly wage was $563.50, yielding a compensation rate of $375.69.
5. Defendant regularly employs three or more employees and is bound by the North Carolina Workers' Compensation Act.
6. In addition, the parties stipulated into evidence the following:
a. I.C. Forms, discovery responses, documents from a prior claim, accident report, job description, photographs and attendance records.
b. Medical records and reports.
c. Affidavits of James Gilliam and plaintiff.
7. The Pre-Trial Agreement dated March 8, 2004 is incorporated by reference.
 ***********
Based upon the competent evidence of record herein, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff was born on August 31, 1952 and is a high school graduate. Plaintiff began working for defendant in 1987. Plaintiff worked at one of defendant's warehouses and performed several different jobs during her employment. In 1999, plaintiff began working as a cigarette auditor, a position she held previously. The job involved obtaining orders from retail stores, checking totes packed with cigarette cartons to make sure they contained the right number of cartons, sealing the totes, and stacking the totes on pallets. Plaintiff also renumbered the totes as they were checked.
2. The totes are plastic containers that nest when stacked. The totes contain cartons of cigarettes and weigh 25-35 pounds each. A full pallet has 25 totes stacked in five layers. The fourth layer of totes was approximately chest high to plaintiff, who is five feet four inches tall, and if there was a fifth layer, it was over plaintiff's head. Approximately one-third of the pallets had at least fours layers of totes. On an average day, plaintiff lifted four to five hundred totes. During a "force-out" week when extra cigarettes were shipped to the stores for sales, plaintiff lifted twice as many totes. There were one or two "force-out" weeks every month.
3. In 1992 and 1993, plaintiff underwent surgery to repair a rotator cuff tear in her right shoulder. Plaintiff recovered well and was released to return to work without restrictions. Around that time, plaintiff also had arthroscopic surgery to her left shoulder. Plaintiff's medical records from 1993 reflect complaints of problems in the left shoulder and plans to perform surgery, but do not include a reference to the procedure being performed. Plaintiff returned to work for defendant and continued working until January 2002, without receiving any further medical care for her shoulders.
4. On January 9, 2002, plaintiff was working on a large order with totes stacked five high. As she was pushing a tote onto the fifth row over her head, the tote caught on something and began to fall back down. Plaintiff reached up with her left hand to catch the tote and push it back, and immediately experienced pain from her left shoulder down the front of her arm to her elbow. As plaintiff was leaving work afterwards, she stopped by her supervisor's office to report her injury, but inventory control supervisor, Mary Ward, was not there. Plaintiff then went to James Gilliam, operations manager, to tell him what happened. Plaintiff told Mr. Gilliam that she thought she had just pulled a muscle. No reports were completed that day and Mr. Gilliam subsequently forgot the conversation.
5. As she had done with her previous rotator cuff tear, plaintiff continued to work despite the pain in her left shoulder. Plaintiff favored her left arm when working, which caused her to use her right arm more. Plaintiff began to notice gradually increasing pain in her right shoulder. Plaintiff did not mention the injury or the symptoms to her supervisor until November 7, 2002, after the employees had been assigned to new teams and there had been a meeting regarding safety incentives. Upon learning of the injury, Ms. Ward completed paperwork and took plaintiff to RoMedical Center. The doctor injected plaintiff's shoulder and prescribed a steroid dosepack for her bilateral shoulder symptoms. Plaintiff did not want to do light duty work and was able to convince the doctor that she could do her regular job with modifications in her lifting technique, so the doctor allowed her to return to work in her normal position.
6. On November 14, 2002, plaintiff returned to RoMedical. Plaintiff's symptoms were significantly improved and the doctor was of the impression that her biceps tendinitis was resolving. Plaintiff was advised to continue her medications and to use ice and heat on an alternating basis.
7. Plaintiff continued to work in her regular job until February 17, 2003. On February 18, 2003, plaintiff called her supervisor to say that she had hurt her arms shoveling ice and snow at home, so she could not work that day. Prior to that time, plaintiff had some knee problems and had seen Dr. Robert Steele, an orthopedic surgeon, several times. Plaintiff made an appointment with Dr. Steele for February 27, 2003 to have him evaluate her shoulders. Plaintiff has not returned to work since February 17, 2003.
8. On February 27, 2003, plaintiff saw Dr. Steele and complained of problems with her shoulders for the past several months. Dr. Steele injected plaintiff's shoulders, which provided her with only temporary relief. Dr. Steele then ordered MRIs, which revealed bilateral rotator cuff tears. As a result, Dr. Steele referred plaintiff to his partner, Dr. Michael Lauffenburger, an orthopedic surgeon specializing in shoulder treatment.
9. On April 2, 2003, Dr. Lauffenburger examined plaintiff. Plaintiff told Dr. Lauffenburger about her prior operations and informed him that she had been doing all right until she injured herself the previous summer. Plaintiff stated that she had had a lot of pain and was no longer able to do her job. Because plaintiff remained symptomatic despite conservative treatment by Dr. Steele, Dr. Lauffenburger recommended surgery to plaintiff's left shoulder. Dr. Lauffenburger performed a left shoulder arthroscopic rotator cuff repair on April 25, 2003. Dr. Lauffenburger repaired a full thickness tear of plaintiff's rotator cuff. Plaintiff did well after the operation and by the first of July was ready to have surgery to her right shoulder. On July 16, 2003, Dr. Lauffenburger performed a right shoulder arthroscopic rotator cuff repair. Dr. Lauffenburger's operative notes state that he found evidence of a partial rotator cuff tear, as well as the presence of chronic bursitis in plaintiff's right shoulder.
10. Following the operation, plaintiff completed the standard follow-up treatment protocol with a period of healing and rest, followed by physical therapy to strengthen and improve the motion of the joint. The function of plaintiff's shoulders became nearly symmetric after a period of time. Although plaintiff had good range of motion, there was residual weakness and lack of endurance. Dr. Lauffenburger gave plaintiff permanent work restrictions that did not allow her to return to work in her former capacity for defendant. Plaintiff remained out of work as of the date of Deputy Commissioner's hearing.
11. At his deposition, Dr. Lauffenburger testified that if plaintiff were asymptomatic in her shoulder prior to her January 9, 2002 accident, he would conclude that the accident specifically caused plaintiff's left shoulder rotator cuff tear. He further stated "to a reasonable degree of medical certainty that the repetitive overhead use contributed to the damage to [plaintiff's] right rotator cuff and certainly specifically caused the bursitis." Dr. Lauffenburger testified that due to the repetitive lifting and reaching required by her job as a cigarette auditor, plaintiff was placed at an increased risk of developing bursitis and chronic rotator cuff tears as compared to the general public not so employed. The lifting and reaching required by plaintiff's job was a significant contributing factor in the development of the bursitis and the rotator cuff tear in her right shoulder. Dr. Lauffenburger testified that without another acute injury, plaintiff's prior surgery and repetitive work were the primary agents contributing to the rotator cuff tear of the right shoulder. His testimony taken as a whole establishes that the contribution from the work activities was, in fact, significant in plaintiff's development of the rotator cuff tear.
12. The greater weight of the evidence shows that plaintiff's bursitis and a chronic rotator cuff tear of the right shoulder constituted an occupational disease, which was due to causes and conditions characteristic of and peculiar to her employment with defendant and which was not an ordinary disease of life to which the general public was equally exposed.
13. The greater weight of the evidence shows that the rotator cuff tear in plaintiff's left shoulder, which was found and repaired by Dr. Lauffenburger, was the proximate result of the January 9, 2002 injury by accident. The Commission finds plaintiff's testimony to be credible and finds that plaintiff was not having shoulder problems prior to the January 9, 2002 accident and at the time of the accident plaintiff had the immediate onset of shoulder and arm pain that persisted until she had surgery. Although the snow-shoveling incident a year later aggravated plaintiff's symptoms, the incident did not constitute an independent intervening cause of her condition. Rather, plaintiff's condition was a direct and natural result of her injury at work.
14. On January 9, 2002, plaintiff sustained an injury by accident arising out of and in the course of her employment with defendant. The fact that the tote slid off the stack so that she had to catch it and push it back up constituted an unusual occurrence that interrupted plaintiff's regular work routine. Plaintiff injured her left shoulder as a result of the accident. Although she did not seek medical treatment for ten months afterwards, plaintiff continued to experience pain in her left shoulder throughout that time. Plaintiff thought that she was being a conscientious employee by not going to the doctor. Her symptoms did improve after she was treated in November 2002, but her left shoulder continued to have pain until February 2003. Plaintiff did not suffer an acute injury in February 2003 when she shoveled ice and snow in her driveway. Rather, plaintiff performed more repetitive work with her shoulders, which were already causing her pain from her January 9, 2003 injury by accident. Plaintiff's symptoms then became severe enough that she sought medical treatment.
15. Plaintiff reported the injury on January 9, 2002 to a second line supervisor, Mr. Gilliam, who did not ask her to complete any paperwork. Plaintiff told Mr. Gilliam that she thought she had pulled the muscle in her arm and that she would wait and see how it progressed, but that she did not think it was anything to be worried about at that time. Plaintiff thought that she complied with defendant's policy by telling Mr. Gilliam about the injury. Having verbally reported the injury, plaintiff gave defendant actual notice of her injury. Since there were no witnesses and since plaintiff did not seek medical treatment until the written report was completed on November 7, 2002, defendant was not prejudiced by the delay in receiving written notice. Defendant argues that it was prejudiced because plaintiff continued to work with left arm pain, causing the development of her right arm symptoms. This argument is not persuasive since plaintiff continued to perform her regular job duties, even after going to the doctor of defendant's choice. Defendant's doctor did not take plaintiff out of work or give her any restrictions. Thus, the earlier receipt of medical treatment would not have prevented further injury to the right shoulder.
16. On November 12, 2003, at plaintiff's request, Dr. Lauffenburger wrote a letter stating that plaintiff reached maximum medical improvement for her shoulders and assigned plaintiff a 24% disability rating, based on the American Medical Association guidelines, to both plaintiff's right and left shoulders. Dr. Lauffenburger testified that 5% of the 24% rating was from plaintiff's prior rating following her 1992 shoulder surgery. Dr. Lauffenburger also indicated that the ratings assigned plaintiff might be different using the Industrial Commission rating guide. In his letter Dr. Lauffenburger also stated that he had not yet released plaintiff, that she had loss of range of motion, loss of strength and persistent pain, and that she required further medical treatment. The issue of whether plaintiff had been released to return to work was not clarified at Dr. Lauffenburger's deposition taken on May 4, 2004. Therefore, the Commission finds that plaintiff was not at maximum medical improvement as of the close of the evidence before the Deputy Commissioner.
17. As a result of the injury by accident and occupational disease giving rise to this claim, plaintiff was unable to work in any capacity beginning February 18, 2003. Dr. Lauffenburger did not release plaintiff to return to work prior to the date of Deputy Commissioner's hearing. In his deposition Dr. Lauffenburger subsequently testified that plaintiff would have permanent restrictions of no working over shoulder level, no lifting more than twenty pounds and no pushing of more than fifty pounds, insofar as her shoulder conditions were concerned. These restrictions prevent plaintiff from returning to work as a cigarette auditor.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. On January 9, 2002, plaintiff sustained an injury by accident arising out of and in the course of her employment with defendant. N.C. Gen. Stat. § 97-2(6).
2. Plaintiff's claim is not barred by her failure to give written notice of her injury to her employer within thirty days because defendant had actual notice of the injury and was not prejudiced by the delay in receiving written notice. N.C. Gen. Stat. § 97-22.
3. Plaintiff's left shoulder rotator cuff tear was a proximate result of her January 9, 2002 injury by accident. N.C. Gen. Stat. § 97-2(6); Click v. FreightCarriers, 300 N.C. 164, 265 S.E.2d 389 (1980); Heatherlyv. Montgomery Components, Inc., 71 N.C. App. 377,323 N.C. App. 29 (1984), cert. denied, 313 N.C. 329,327 S.E.2d 189 (1985).
4. In February 2003, plaintiff developed bursitis and a chronic rotator cuff tear in her right shoulder, which constituted an occupational disease due to causes and conditions characteristic of and peculiar to plaintiff's employment and which were not ordinary diseases of life to which the general public was equally exposed. N.C. Gen. Stat. § 97-53(13). Booker v. Medical Center,297 N.C. 458, 327 S.E.2d 890 (1979).
5. In order to meet the burden of proving disability, plaintiff must prove that she was incapable of earning pre-injury wages in either the same or in any other employment and that the incapacity to earn pre-injury wages was caused by plaintiff's injury. Hilliard v. ApexCabinet Co., 305 N.C. 593, 290 S.E.2d 682 (1982). An employee may meet the initial burden of production by producing one of the following: (1) medical evidence that she is physically or mentally, as a result of the work-related injury, incapable of work in any employment; (2) evidence that she is capable of some work, but that she has, after a reasonable effort, been unsuccessful in her efforts to obtain employment; (3) evidence that she is capable of some work, but that it would be futile because of preexisting conditions, such as age, inexperience, or lack of education, to seek employment; or (4) evidence that she has obtained other employment at wages less than his pre-injury wages.Demery v. Perdue Farms, Inc., 143 N.C. App. 259,545 S.E.2d 485 (2001); Russell v. Lowes ProductDistribution, 108 N.C. App. 762, 425 S.E.2d 454 (1993) (citations omitted). When a plaintiff meets her burden of showing disability, the burden then shifts to defendants to produce evidence that suitable jobs are available for the employee and that the employee is capable of obtaining a suitable job, taking into account both physical and vocational limitations. Demery v.Perdue Farms., Inc., supra.
6. In the present case, the greater weight of the medical evidence showed that as a result of the compensable injury by accident and occupational disease, plaintiff was not capable of working in any employment after February 18, 2003. Therefore, plaintiff was temporarily totally disabled and entitled to receive compensation for temporary total disability at the rate of $375.69 per week beginning February 18, 2003 and continuing until she returns to work or until further order of the Commission. N.C. Gen. Stat. § 97-29.
7. Plaintiff is entitled to have defendant pay for medical expenses incurred or to be incurred as a result of the compensable injury as may be required to provide relief, effect a cure or lessen the period of disability. N.C. Gen. Stat. §§ 97-2(19); 97-25.
8. The extent of plaintiff's permanent functional impairment to her arms has not yet been determined. N.C. Gen. Stat. § 97-31(13).
 ***********
Based upon the foregoing stipulations, findings of fact, and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendant shall pay compensation to plaintiff for temporary total disability at the rate of $375.69 per week beginning February 18, 2003 and continuing until plaintiff returns to work or until further Order of the Commission. The portion of this compensation that has accrued shall be paid in a lump sum. This award is subject to the attorney's fee approved below.
2. Defendant shall pay all medical expenses incurred by plaintiff as a result of the compensable injury by accident and occupational disease.
3. An attorney's fee in the amount of 25% of the compensation awarded is approved for plaintiff's counsel. Defendant shall deduct and pay the fee from the accrued compensation and shall thereafter pay plaintiff's counsel every fourth check.
4. The extent of plaintiff's permanent functional impairment to her arms is reserved for future determination.
5. Defendant shall pay the costs.
This the 15th day of July 2005.
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
 S/_____________ THOMAS J. BOLCH COMMISSIONER
 S/_______________ DIANNE C. SELLERS COMMISSIONER